**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VERA ELUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL REQUESTED |

**COMPLAINT**

Now comes the Plaintiff Vera Elue (herein "Plaintiff"), by and through her attorneys Michael D. Robbins, Michael D. Robbins and Associates, and Marty Denis and Bethany Hilbert, Barlow, Kobata & Denis LLP, and for her Complaint against the City of Chicago and states as follows:

**NATURE OF THE CASE**

1.      This lawsuit arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*, and the Civil Rights Act of 1991 (herein "Title VII"), and the Illinois Whistleblower Act, 740 ILCS 174/1 *et. seq.* (herein "IWA").

**JURISDICTION AND VENUE**

2.      Federal jurisdiction arises over the subject matter of this Complaint pursuant to Title VII and 28 U.S.C. §§1331 and 1343. There is supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. §1367.

3.      Pursuant to 28 U.S.C. §1391 venue lies in the Northern District of Illinois in that Plaintiff is a resident of this District, Defendant is engaged in business in this District, and a substantial part of the events giving rise to the claims alleged in this Complaint occurred in this District.

1

## PARTIES

4.      The Defendant City of Chicago is an entity located in this District, and it provided and now provides municipal services.

5.      The Defendant was at all times relevant hereto an "employer" within the meaning of Title VII and also as an "Employer" as defined in the Illinois Whistleblower Act. Defendant has either engaged in interstate commerce or an activity affecting commerce within the meaning of Title VII.

6.      For the years 2013, 2014, 2015, and 2016, the Defendant has employed more than 500 employees.

7.      Plaintiff Vera Elue (herein "Plaintiff") is a resident of Cook County, Illinois. At all times relevant hereto, Plaintiff was an "employee" within the meaning of Title VII and also an "Employee" as defined in the Illinois Whistleblower Act.

## EEOC ADMINISTRATIVE PROCEDURES

8.      On February 24, 2014 Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant alleging violations of Title VII. That Charge of Discrimination was Charge No. 440-2014-02574. Plaintiff's Charge of Discrimination alleged, among other allegations, that the City of Chicago Department of Business Affairs discriminated against her because of her race, denied her a promotion because of her race and because of her complaints about race discrimination, and retaliated against her because she complained to the Defendant about race discrimination.

9.      In a letter dated July 5, 2016, the United States Department of Justice, Civil Rights Division, issued the Plaintiff a Notice of Right to Sue Within 90 days. The Plainitff received a copy of that Notice of Right to Sue on July 11, 2016. A copy of that Notice of Right to Sue is attached as Exhibit A.

10. The Plaintiff timely filed this lawsuit within ninety (90) days of her receipt of the Notice of Right to Sue.

11. Plaintiff has fulfilled all conditions precedent to the institution of this lawsuit under Title VII.

### FACTUAL SUMMARY

12. Plaintiff's race is African American. Since at least January 1, 2012 the Defendant was aware that the Plaintiff's race was African American

13. The Plaintiff graduated from the Nigerian Law School University of Lagos in January 1985, and received a Masters Degree from that law school.

14. In January 1998, the Plaintiff graduated from Loyola University Law School, and the Plaintiff was admitted to practice before the Supreme Court of Illinois as an attorney in 1998.

15. Between January 1998 and January 2000, the Plaintiff was the Coordinator of Contract Compliance for the City of Chicago and its Department of Purchases. As the Coordinator of Contract Compliance, the Plaintiff's job duties included reviewing and evaluating the qualification of firms for participation in the DBE/MBE/WBE programs to ensure compliance with the relevant regulations, statutes, and ordinances regulating those programs.

16. Between January 2000 and January 2001 the Plaintiff was a Contract Negotiator for the City of Chicago and its Department of Purchases. As a Contract Negotiator, the Plaintiff's job duties included managing and coordinating the negotiation and preparation of major City contracts, writing FRQ/P, coordinating and directing the development of major contracts, reviewed and evaluated proposals to determine the financial status of vendors, prepared price and cost analysis of contracts, directed and oversaw the evaluation process, supervised and trained

subordinate staff engaged in contract administration and negotiation activities, and prepared a variety of reports on contract status and negotiation activities.

17. Between January 2005 and January 21, 2014, the Plaintiff was the Coordinator of Special Projects for the City of Chicago and its Department of Business Affairs and Consumer Protection. As the Coordinator of Special Projects, the Plaintiff was the senior legal counsel on complex cases and transactional matters, oversaw the preparation of major prosecutions and settlement agreements to which the Department was a party, functioned as the sole litigation attorney in the areas of consumer fraud, vacation rentals, valet parking, truck-weight enforcement, major vehicle repair shops, and other violations by other city licensed businesses.

18. As a part of her job as the senior legal counsel on complex cases and transactional matters for the Department of Business Affairs and Consumer Protection, the Plaintiff:

   a. supervised and managed other City employees in conducting legal research on local, state, and federal laws and ordinances relating to her cases, and conducted strategy meetings with the Department's Commissioner and staff on areas relating to consumer protection enforcement, as well as truck-weight enforcement;

   b. supervised and managed new attorneys, law clerks, interns, and investigators to improve and expand that Department's services, including supervising, managing, and training staff to how to properly review complaints, case preparations, court skills, effective implementation of Department goals, assisting businesses, and the protection of consumers, and directing subordinate staff members responsible for executing the Department's programs and policies;

c.  represented the Department in hundreds of administrative proceedings by presenting opening statements, conducting the direct and cross examination of witnesses, presenting closing statements, and settlement negotiations;

d.  generated over $20,500,000.00 in consumer retail and fraud prosecutions for the City;

e.  was the highest revenue generating attorney in that Department; and

f.  reported to Barbara Gressel, who was the Deputy Commissioner, between January 2005 and March 2014.

19.  As of October 3, 2013, the Plaintiff:

a.  Had worked as a Coordinator of Special Projects for the City of Chicago and its Department of Business Affairs and Consumer Protection for ten years and had supervised twenty-five (25) employees;

b.  Had worked as a Contract Negotiator for the City of Chicago and its Department of Purchases for one year and had supervised four employees;

c.  Had worked as a Coordinator of Contract Compliance for the City of Chicago and its Department of Purchases for two years and had supervised five employees;

d.  Had at least five years of litigation experience of which at least two years had been in a managerial role;

e.  Was a resident of Chicago;

f.  Had been admitted to the Illinois Bar; and

g.  Had graduated from an American Bar Association accredited law school.

20.  Between January 2005 and October 3, 2013 the Plaintiff satisfactorily performed all of the duties and responsibilities of her job.

21.     Throughout the over fifteen (15) years of her employment with Defendant between January 2005 and October 3, 2013, the Plaintiff was a loyal, competent, and dependable employee and attorney for the Defendant.

22.     As of October 3, 2013, the Plaintiff had over fifteen (15) years of work experience in the following areas:

a.      handling high volume legal cases;

b.      litigating legal cases on behalf of the Department in which she had worked;

c.      had handled over 100 legal cases each day;

d.      had handled between 20 and 30 consumer fraud legal cases each week;

e.      had handled two to three times a week retail cases, with each case involving 15 or more citations or tickets;

f.      had negotiated over 10,000 settlements involving retail and consumer fraud cases; and

g.      had run reports involving the Business Objects Software.

23.     In March 2012 a complaint was filed with the Illinois Attorney Registration and Disciplinary Commission complaining about the unauthorized practice of law by a Manager of Collections/Public Way who worked in the same Department of Business Affairs and Consumer Protection (herein, the "Department") that the Plaintiff had been working. The complaint alleged that this Manager of Collections/Public Way was violating Illinois law, rules, and regulations, including violating the Rules Governing the Legal Profession and Judiciary in Illinois, the Illinois Supreme Court Rules on Admission and Discipline of Attorneys, the Illinois Rules of Professional Conduct, and the Rules of the ARDC. That complaint alleged that this Manager of

6

Collections/Public Way had violated these latter rules because he was not an attorney and he was practicing law on behalf of the Department.

24.    Barbara Gressel, the Deputy Commissioner for the Department requested that the Plaintiff sign an affidavit to be filed with the ARDC and other agencies investigating the complaint that had been filed against the law clerk. Gressel requested that the Plaintiff state in that affidavit that this Manage of Collections/Public Way had not practiced law on behalf of the Department, that he had not practiced law on behalf of the Department in violation of Illinois law, rules, and regulations, that, moreover, the Plaintiff oversaw and supervise his work in court, that he only assisted the Plaintiff in court.

25.    The Plaintiff told Gressel that the affidavit statements that Gressel had requested the Plaintiff to make in an affidavit were not true, and the Plaintiff refused to sign an affidavit containing those untrue statements.

26.    Despite the Plaintiff's refusal to sign an untrue affidavit, Gressel insisted that the Plaintiff sign an affidavit containing the untrue statements. Gressel told the Plaintiff that she, the Manager of Collections/Public Way, and the City of Chicago wanted the Plaintiff to sign the affidavit containing the untrue statements.

27.    An attorney for the City of Chicago drafted an affidavit containing the untrue statements and requested that the Plaintiff sign the affidavit with the untrue statements.

28.    The Plaintiff refused to sign the affidavit with the untrue statements that the City's attorney asked that she sign. The Plaintiff told the City's attorney and Gressel that she was refusing to sign an affidavit containing untrue statements, and the Plaintiff complained to the City's attorney and Gressel to stop asking her to sign an affidavit containing untrue statements.

7

29.     The Manager of Collections/Public Way sent Gressel an affidavit containing untrue statements describing his work and stating untrue facts about whether he was practicing law without a license. Gressel approved the affidavit for him to sign, and that affidavit contained untrue and false statements.

30.     In 2012, 2013, 2014, 2015, and 2016 the Department in which the Plaintiff worked was a law enforcement agency.

31.     On July 9, 2013 the Plaintiff complained to Rosemarie Krimbel, the Department's Commissioner, that Gressel was involved in an ethical violation involving her job duties. Krimbel told the Plaintiff to talk to Gressel

32.     Two days later, on July 11, 2013, Gressel approached the Plaintiff, banged her hand on the Plaintiff's desk, and Gressel told the Plaintiff to never, on her life again, ever complain to the Commissioner or anyone else about Gressel or even mention Gressel's name in any complaint to the Department or any other public agency. Gressel also told the Plaintiff that, if she ever complained to the Commissioner or anyone else about Gressel, that Gressel would fix her, get her, and teach the Plaintiff a lesson she would never forget. In making those statements to the Plaintiff on July 11, 2013, Gressel screamed and yelled profanities at the Plaintiff, cursed the Plaintiff, and told the Plaintiff never to "fucking" file or make any complaints about the Plaintiff about anything.

32.     In July 2013 the Plaintiff filed a complaint with the Inspector General for the City of Chicago alleging that the Department and Gressel had violated Illinois law, rules, and regulations.

33.     During the Summer of 2013, the Plaintiff complained to Gressel, the Deputy Commissioner, that Department staff and investigators who were African American, including

African American investigators with 12 to 15 years of experience, were being discriminated against and treated differently regarding their terms and conditions of employment than how the Department treated Caucasian staff and investigators. Gressel refused to take any action to either investigate the situation or take curative steps to remedy or stop the discrimination.

34. The Department posted a Job Announcement to fill a vacancy for Assistant Commissioner in the Department. The job posting was open on October 28, 2013, and the closing date of that Job Announcement was November 6, 2013. The Job Posting stated, in part, that "The position requires applicants to complete an interview which will include a written exercise and/or a skills assessment test as part of the interview. The interviewed candidate(s) possessing the qualifications best suited to fulfill the responsibilities of the position, based on the oral and written parts of the interview will be selected." The Job Announcement also stated that the selected candidate needed experience "supplemented by five years of litigation experience of which at least two years are in a managerial role."

35. In August 2013 the Manager of Collections/Public Way told the Plaintiff that Gressel said that she was going to become the Deputy Commissioner and that Jim Potter had been selected to be the Assistant Commissioner.

36. Upon learning of this Job Announcement, the Plaintiff told Gressel that she was interested in applying for the Assistant Commissioner position and that she wanted to apply for that position. In response to the Plaintiff's statement, Gressel told the Plaintiff that she should not apply for the Assistant Commissioner position, that she, Gressel, wanted to give that Assistant Commissioner to a person who was outside of the Department, and that the Plaintiff was such a valuable employee in the Department and in her current position as the litigation counsel handling both the Retail and Fraud administrative hearing litigation calls, that Gressel did not

want to lose the Plaintiff from handling those administrative litigation calls. Gressel also told the Plaintiff that she, Gressel, did not want the Plaintiff to obtain this Assistant Commissioner job.

37.     On November 3, 2013 the Plaintiff applied for the Assistant Commissioner position. At the time the Plaintiff applied, she was qualified for the Assistant Commissioner position, and the Plaintiff was a resident of the City of Chicago, had been admitted to the Illinois Bar, had at least five years of litigation experience of which at least two years had been in a managerial role, had graduated from an American Bar Association accredited law school, and since 2005 the Plaintiff had been the Acting Senior Hearing Officer/Senior Counsel for the Department handling retail litigation and fraud litigation cases for the Department. In addition to the application that the Plaintiff submitted, the Plaintiff provided the Defendant a copy of her then current resume, a copy of her diploma from Loyola Law School that had been awarded in May 1998, a copy of her Bachelor of Laws degree from the University of IFE that had been awarded in July 1983, and a copy of her degree from the Nigerian Institute of Advanced Legal Studies that she had been awarded in January 1989.

38.     On October 21, 2013, William Campbell Basek, who worked as a law clerk for the Department, and John Mariane told the Plaintiff that Sam Kavathas, an attorney who represented clients before the Department's administrative hearings and proceedings, and who had Jewel Food Stores as one of his clients, had told them that the Plaintiff should not be handling the litigation calls in those proceedings and that a white man should be running those calls.

39.     On October 21, 2013, William Basek and John Mariane, in the presence of the Plaintiff, told Thadddeus Wilkins, the Consumer Call Senior Administrative Law Judge, that Kavathas had made racial statements and had, based on racial grounds, refused to deal with the

Plaintiff who was trying to handle the Department's prosecutions. Senior Administrative Law Judge Wilkins asked both Basek and Mariane about what Kavathas had said, and both Basek and Mariane said that Kavathas said he wanted a white man to handle the Department's cases involving his client Jewel Foods and that he would not deal with the Plaintiff in her prosecution of cases.

40. That same day October 21, 2013, the Plaintiff complained to Commissioner Krimbel that Sam Kavathas had made those statements and had been asking to have the Plaintiff removed from handling the litigation calls and that a white man run those calls. Commissioner Krimbel requested that Gressel write a letter to Kavathas denying his request.

41. For two weeks in October 2013, the Plaintiff asked Gressel whether, as Commissioner Krimbel had requested, she had written the letter to Kavathas, and Gressel refused to answer the Plaintiff to say what she intended to do. On at least three occasions the Plaintiff in writing asked Gressel whether she would write the letter the Commissioner Krimble had requested that she write. In an October 29, 2013 note from the Plaintiff to Gressel, the Plaintiff asked that Gressel give her a copy of the letter or form the Commissioner had asked Gressel to send to Kavathas.

42. Gressel did not write a letter to Kavathas denying his request to remove the Plaintiff from handling the litigation calls and replacing her with a white man to run those calls.

43. On November 5, 2013, when the Plaintiff attempted to carry out her job duties in court in prosecuting cases against clients represented by Kavathas, Kavathas refused to deal with the Plaintiff. That same day the Plaintiff again complained to Gressel that Kavathas was refusing to deal with her because of Kavathas stated racial preference and Kavathas' insistence that only a white man deal with him involving the Department's prosecutions.

11

44.     After two weeks of asking Gressel whether she had written the letter, the Plaintiff went to Gressel's office and asked Gressel whether she had written the letter to Kavathas. Plaintiff told Gressel that Kavathas was refusing to deal with her in the court room because she was an African American and that Kavathas had been insisting that a white man be assigned to deal with him and his client's cases. Gressel said she had not written the letter. Gressel asked that William Basek come to her office. Gressel asked Basek what had happened in court regarding Kavathas' statements. In the presence of Gressel and the Plantiff, Basek said that he had heard Kavathas say in court that the Plaintiff should not be in court and that a white man should be running the call.

45.     That same day November 10, 2013 Gressel told the Plaintiff that she wanted the Plaintiff to prepare all the cases, get settlement offers, write up what the offers should be, and that the white guys, including John Mariane and William Basek, would then make the settlement offers to Kavathas. The Plaintiff complained that to remove her from her prior duties of making settlement offers would be agreeing with Kavathas that white guys should handle the call and that because she was African American, the Plaintiff should not be working that job. Nonetheless, Gressel said that she wanted the white guys to handle the settlement offers to Kavathas and that the Plaintiff should stop doing that work.

46.     Following Gressel's instructions in November 2013 the Plaintiff was removed from handling settlement offers during the litigation calls to Kavathas.

47.     On November 21, 2013 the Plaintiff sent an email to the Commissioner Krimbel, with a cc: or copy sent to Gressel stating, in part, that she had reported to Gressel that she, the Plaintiff, had "returned to court and was told by William (Basek) that Sam (Kavathas) came in again and expressed his interest by saying that 'White man should be running this place,' that

12

"Sam (Kavathas) cannot deny his racial antagonism against me. William, our Law clerk was there when he made his declaration and John was there too but John has since conveniently forgotten that Sam expressed his racial preference. William confirmed it to Barbara that he heard Sam say it, but expressed fear, as according to him, he does not want problems and does not get paid enough to deal with this. He said that he would not have told me if he knew that I would report it to you.", that "After I was told by William of Sam's improper expression, I communicated it to Barbara, my immediate supervisor.", and "I see Sam's action as unethical and unbecoming of an attorney and I am waiting to see how this is handled from the City before I exercise my other options."

48.     In approximately December 2013, the Plaintiff was interviewed for the Assistant Commissioner job by Commissioner Krimble and Gressel. During that interview, neither Krimble nor Gressel asked any questions about any computer skills that the Plaintiff had or had used, and neither of them asked any questions about the Business Objects software subject, or whether the Plaintiff was familiar with the Business Objects software.

49.     As a part of her application for the Assistant Commissioner job and the interviewing and selection of candidates for that position, the Plaintiff was not given a written exercise and/or a skills assessment test as part of the interview.

50.     In January 2014, during a meeting with Commissioner Guerra, Gressel, and other staff members, Gressel said that the Plaintiff was a problem employee who Gressel wanted removed from the Retail Call and the Fraud Call, and the Commissioner said that the Plaintiff would be removed from the Retail call and the Fraud call.

51.     On January 21, 2014, the Plaintiff was told that she was being removed from handling the Retail Call. Prior to January 21, 2014, the Plaintiff had handled the Retail Call for

over ten (10) years. The Plaintiff was removed from handling the Retail Call, and Matt Frost, an attorney with a few years' experience in litigation and whose race is Caucasian, replaced the Plaintiff and Matt Frost then handled the Retail Call.

52. Prior to being removed from handling the Retail Call on January 21, 2014, the Plaintiff had spent approximately three out of the five days per week that the Plaintiff worked in handling the Retail Call.

53. On January 21, 2014, the Plaintiff asked Gressel if she was being removed from the Retail Call because of retaliation. Gressel did not make any response to Plaintiff's question, and Gressel gave the Plaintiff no explanation for why the Plaintiff had been removed from the Retail Call.

54. On February 7, 2014 the Department announced that it had selected Jim Potter, a Caucasian, to be the Assistant Commissioner. The Plaintiff was not selected to be the Assistant Commissioner.

55. As of December 2013 the Plaintiff had substantially more litigation experience than Potter did. As of December 2013 Potter did not have any managerial experience, and the Plaintiff had several years of managerial experience.

56. In the Summer of 2013 and again in February 2014 the Plaintiff filed a complaint with the City of Chicago Inspector General alleging that employees in the Plaintiff's Department had committed ethical violations and discriminated and retaliated against the Plaintiff.

57. In March 2014 Gressel and Commissioner Guerra told the Plaintiff that effective April 1, 2014 that the Plaintiff would no longer handle the Fraud Call. During a meeting with Guerra, Gressel, and the Plaintiff in March 2014, Guerra said that the Plaintiff was an excellent attorney and that she was doing a good job, Gressel said that the Plaintiff was an extraordinary

14

attorney, that the Plaintiff made other attorneys, including Gressel, a better attorney, that the Plaintiff was the best attorney that they had in the Department, that the Plaintiff was amazing and the most experienced attorney, that the Plaintiff was the most prepared attorney that they had in the Department, and that they wanted to change the Plaintiff's job duties and responsibilities where she no longer handled the Fraud Call or fraud call cases so that she could handle some laws that were being enacted in the future. During that meeting the Plaintiff asked whether she would be assigned to handle or could handle any more court cases. Gressel said that the Plaintiff was not going to handle any more court cases, that she, Gressel, understood that the Plaintiff would not like not handling any more court cases, and that the Plaintiff would be taken out of and away from handling any court cases. During that meeting, the Plaintiff asked if she had done anything wrong, and Guerra and Gressel said that the Plaintiff had not done anything wrong.

58.     Starting on April 1, 2014, the Defendant assigned the Plaintiff to handling community hearings, where she met with community groups to listen to and try to resolve their complaints about various community complaints. Conducting and scheduling community hearings became the Plaintiff's primary job duty after April 1, 2014, and in 2015 and 2016 conducting community hearings has involved 85% of the Plaintiff's work time. The community hearings that the Plaintiff was assigned after April 1, 2014 did not involve litigation or courtroom activities or work.

59.     Prior to the Defendant removing the Plaintiff from handling the Retail Call in January 2014 and removing her from handling the Fraud Call in March 2014, the Plaintiff had handled hundreds of cases each year three to four times a week where she appeared as an attorney before an administrative law judge. During those administrative law judge proceedings the Plaintiff had regularly provided opening and closing statements, called and examined

witnesses, presented evidence, cross-examined witnesses, taken discovery, filed and argued motions, including motions to dismiss, briefed jurisdictional, venue, and constitutional arguments, drafted briefs for the law judges, and provided post-hearing arguments and post-hearing briefs.

60.     An important part of and measure of the Plaintiff's job duties in handling the Retail Call and the Fraud Call was the amount of revenue in fines that were generated from her prosecution of cases before the Administrative Law Judges. In 2013 and for several prior years, the Plaintiff's prosecution efforts and litigation work generated approximately $10,000,000 per year in fines. Restitution fines of approximately $500,000 per year were also generated as a result of the Plaintiff's prosecution and litigation work.

61.     After the Plaintiff was removed from her Retail Call and Fraud Call assignments, her job duties involving any administrative law judge hearings or litigation were substantially reduced. For example, in 2016 Plaintiff's in-court cases between January 1, 2016 and October 5, 2016 involved six cases. In 2015, the Plaintiff had approximately ten in-court cases. Between April 1, 2014 and December 31, 2014, the Plaintiff had approximately ten in-court cases. Previously, in 2013 and the prior years, Plaintiff personally handled hundreds of in-court cases each year. In 2015 and from January 1, 2016 to September 30, 2016, the Plaintiff's work has generated approximately $100,000 in fines and $90,000 in restitution, as compared to the approximate $10,000,000.00 in fines and $500,000 in restitution per year that she generated in 2013 and for several years prior to 2013.

62.     Between November 3, 2013 and October 1, 2016, the Plaintiff was qualified for her job and satisfactorily performed her job duties.

16

63.     Within a period of less than 2 ½ months between January 21 and April 1, 2014, the Defendant significantly diminished material responsibilities that the Plaintiff had had for over ten (10) years as the Department's Senior Counsel on complex cases and transactional matters and overseeing the preparation of major prosecutions by the Department.

64.     Within that 2 1/2 month period, the Defendant took away the job duties and responsibilities that the Plaintiff had been handling involving the Retail Call and the Fraud Call, including taking away the multiple cases the Plaintiff had been involved with in handling those court calls, the job duties she had spent reviewing the documents involving those cases, preparing those court cases, and acting as a litigation and courtroom attorney. In so doing, the Defendant materially adversely affected the terms and conditions of the Plaintiff's employment. The Defendant, by its conduct, also dissuaded the Plaintiff from making or supporting her Charge of Discrimination, assigned the Plaintiff substantially less desirable and less agreeable duties and responsibilities, sabotaged and impeded the Plaintiff's career with the Defendant, and significantly reduced and negatively impacted the Plaintiff's pay and promotional opportunities with the Defendant and other possible employers.

65.     By its actions, the Defendant stripped the Plaintiff of her authority as a court room attorney and as the Senior Counsel for her Department, caused her to be virtually powerless as a courtroom attorney and Senior Counsel for her Department, and significantly reduced her career prospects by preventing her from using the attorney and litigation skills in which she had been trained and had acquired over fifteen (15) years of experience in the court room such that her attorney and litigation skills are likely to atrophy and her legal career likely to be stunted.

66.     By its actions, the Defendant so severely restricted the Plaintiff's duties as a litigation attorney such that she was neither a courtroom attorney, nor a litigation attorney prosecuting cases.

67.     By its actions, the Defendant negatively impacted the Plaintiff's current compensation, negatively impacted the Plaintiff's future compensation, assigned the Plaintiff to what was, in effect, a dead-end job, and set the Plaintiff up for a potential layoff or reduction in force.

68.     Caucasian attorneys who had been assigned the job duties and responsibilities which the Plaintiff was assigned after April 1, 2014 to handle community hearings have repeatedly objected to performing those job duties and responsibilities, have refused to perform those job duties and responsibilities for more than a week, and have been allowed to promptly assume more responsible attorney positions.

## COUNT I – TITLE VII VIOLATIONS

69.     Plaintiff repeats and re-alleges paragraphs 1-68 as if fully set forth herein.

70.     At all relevant times between 2012 and 2016 the Plaintiff was qualified to perform her job duties and responsibilities with the Defendant and she satisfactorily performed her job duties and responsibilities.

71.     During her employment with the Defendant in 2012, 2013, and 2014 the Plaintiff's job performance was sufficiently satisfactory that the Defendant was neither warranted nor justified in disciplining the Plaintiff. Nor did the Plaintiff's job performance during that latter time period warrant or justify removing the Plaintiff's job duties and responsibilities in handling either the Retail Call or the Fraud Call.

18

72. The Plaintiff complained about race discrimination to the Defendant on several occasions, including in the summer of 2013 involving how African American staff and investigators were being treated less favorably regarding their terms and conditions of employment, in October and November 2013 regarding how the Department directed that she not handle certain cases because she was African American and that a white man and white guys handle those cases, and the Plaintiff filed a Charge of Discrimination with the EEOC complaining about race discrimination and retaliation by the Defendant in February 2014.

73. Defendant, including Gressel, discriminated against and retaliated against the Plaintiff for her complaints about race discrimination by, among other actions, assigning the Plaintiff to significantly less desirable working assignments, giving Caucasian employees more favorable job assignments, denying the Plaintiff a promotion to the position of Assistant Commissioner, refusing to give the Plaintiff job assignments involving litigation and courtroom settlement efforts because Sam Kavathas insisted that he only wanted to work with a white man and refused to work with the Plaintiff because she was an African American, removing the Plaintiff from the Retail Call and Fraud Call, and assigning her to demeaning and significantly less responsible job duties.

74. The Plaintiff engaged in protected activity under Title VII by complaining to Gressel about race discrimination involving African American staff and investigators, complaining to Gressel and Krimbel about the refusal of Sam Kavathas to work with her because she was African American and his insistence that he would only work with a white man, filing a Charge of Discrimination with the EEOC, and filing an internal complaint with the City of Chicago alleging race discrimination and retaliation.

75.    By its actions, the Defendant knew that and/or showed reckless disregard for whether its conduct was prohibited by Title VII, the Defendant recklessly discriminated against and retaliated against the Plaintiff in violation of Title VII, and the Defendant engaged in unlawful employment practices on the basis of the Plaintiff's race and retaliated against the Plaintiff for complaining about race discrimination.

76.    The retaliatory actions included denying the Plaintiff a promotion, taking away significant job duties and responsibilities which the Plaintiff had performed for over fifteen (15) years involving handling court hearings and prosecutions, assigning her to a dead-end job, and subjecting her to the loss of other employment opportunities.

77.    Because of the Defendant's discriminatory and retaliatory actions, the Plaintiff was damaged and has suffered the loss of wages and benefits, humiliation, embarrassment, and other compensatory damages.

78.    The above-described actions by the Defendant were taken deliberately and intentionally and with malice and reckless indifference to the Plaintiff's civil rights.

79.    The above-described actions were ratified, authorized, and permitted by the Defendant's managers and agents, including by Gressel, Krimble, and Guerra.

80.    As a direct and proximate result of the illegal conduct and actions by the Defendant, the Plaintiff has been deprived of economic benefits, of a promotion to Assistant Commissioner, and suffered emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that this Court enter judgment in her favor and against the Defendant and requests that the Court:

A.  Declare, decree, and adjudge that the Defendant violated Title VII;

20

B.  Grant an injunction against the Defendant from violating Title VII and to protect the Plaintiff and other African American employees from such civil rights violations;

C.  Enter appropriate injunctive relief awarding the Plaintiff the back pay, front pay, wages, employee benefits, and other compensation that she was denied or lost;

D.  Order the Defendant to pay the Plaintiff compensatory damages;

E.  Award the Plaintiff pre-judgment and post-judgment interest to which she is entitled;

F.  Award the Plaintiff her reasonable attorney's fees and costs; and

G.  Award such other and further relief as is just and appropriate, including nominal damages.

## COUNT II – ILLINOIS WHISTLEBLOWER ACT

81.  Paragraphs 1-7 and 13-68 of this Complaint are re-alleged as though fully set forth herein.

82.  The Plaintiff filed a complaint with the Inspector General for the City of Chicago in the Summer of 2013 and again in February 2014 complaining that the Defendant had violated Illinois law, rules, and regulations. As of the December 2013 the Defendant knew that the Plaintiff had complained about Defendant's illegal practices to the Inspector General for the City of Chicago.

83.  As of December 2013, the Defendant knew that it was being investigated by the Inspector General for the City of Chicago as a result of Plaintiff complaint.

84.  The Defendant knew that the Plaintiff had reported that the Plaintiff had reported to the Inspector General for the City of Chicago that the Plaintiff had complained that the Defendant was violating Illinois law, rules, and regulations.

85. As of April 2012, the Defendant knew that the Plaintiff had complained to the Department and to an attorney in the Defendant's Law Department that she had been requested by the Defendant to sign an affidavit that contained untrue statements regarding whether a Department employee had practiced law in violation of Illinois law, rules, and regulations and that the Plaintiff refused to sign such an affidavit.

86. The Defendant also knew by late April 2012 that the Plaintiff had refused to sign a false affidavit and that she refused to perjure herself.

87. Defendant's actions in requesting the Plaintiff to sign a false affidavit and to perjure herself violated federal and state law and state rules and regulations.

88. By July 10, 2013 the Defendant knew that the Plaintiff had complained to Commissioner Krimbel that Gressel had engaged in ethical violations regarding her job duties.

89. Defendant's actions in removing the Plaintiff from handling the Retail Call on January 21, 2014 and from handling the Fraud Call on April 1, 2014, denying the Plaintiff a promotion to the position as an Assistant Commissioner on February 7, 2014, and in assigning the Plaintiff to a dead-end job handling community hearings were in retaliation because she complained about violations of federal law and Illinois law, rules, and regulations.

90. There has at all pertinent times been in effect in the State of Illinois an act known as the "Illinois Whistle Blower Act," 740 174/1 *et seq.* (herein "IWA").

91. The Defendant had a duty under Illinois law not to retaliate against employees in violation of the IWA.

92. Falsifying an affidavit and signing an affidavit that contains false information and statements violates federal law and Illinois law, rules, and regulations, including Rule 8.4 of the Supreme Court of Illinois Rules of Professional Conduct.

93.     The Plaintiff had reasonable cause to believe that the Department's request that she sign a false affidavit and perjure herself violated federal law and Illinois law, rules, and regulations.

94.     The Defendant violated the IWA by retaliating against the Plaintiff because of her complaints about the Defendant's violations of federal law and Illinois law, rules, and regulations.

95.     The Defendant violated the IWA by retaliating against the Plaintiff because of the Plaintiff's refusal to participate in activities that would result in a violation of federal law and Illinois law, rules, and regulations.

96.     The retaliatory actions the Defendant took against the Plaintiff, including removing her from the Retail Call, removing her from the Fraud Call, and denying her a promotion, were taken by the Defendant in retaliation for her activities, those were materially adverse actions that adversely affected her compensation, promotion opportunities, and career opportunities, and those actions violated the IWA.

97.     As a consequence of the Defendant's actions, the Plaintiff has been damaged, including a loss of wages, and, benefits, and Plaintiff has suffered emotional distress.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Court enter judgment in her favor and against the Defendant and requests that:

a.      Order the Defendant to pay the Plaintiff's back pay, wages, employment benefits, and other compensation that she was denied or lost as a result of the Defendant's actions, including prejudgment interest on such amounts;

23

b.    Order the Defendant to pay the Plaintiff compensatory damages, including for the emotional distress damages she suffered;

c.    Order the Defendant to pay the Plaintiff punitive damages;

d.    Awarding Plaintiff her reasonable attorney's fees and costs;

e.    Award such other and further relief as is just and appropriate, including nominal damages.

## JURY DEMAND

Plaintiff demands a trial by jury on all Counts.

Respectfully submitted,

Dated: October 6, 2016

/s/ Marty Denis
One of the Attorneys for Plaintiff

Michael D. Robbins
MICHAEL D. ROBBINS & ASSOCIATES
20 North Wacker Drive, Suite 3710
Chicago, Illinois 60606
Tel: (312) 899-8000
Fax: (312) 781-9123

Marty Denis
Bethany Hilbert
BARLOW, KOBATA & DENIS LLP
525 W. Monroe, Suite 2360
Chicago, Illinois 60661
Tel: (312) 648-5570
Fax: (312) 648-9697

Attorneys for Plaintiff Vera Elue