VERA ELUE,

        Plaintiff,

    v.

CITY OF CHICAGO,

        Defendant.

No. 16 CV 9564

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Vera Elue, an attorney for the City of Chicago, brings Title VII and Illinois Whistleblower Act claims alleging that the City discriminated against her because of her race and in retaliation for her protected activities by failing to promote her and assigning her to non-legal administrative tasks. The City moves for summary judgment on all counts. For the reasons discussed below, the City's motion is granted in part, denied in part.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no

genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Background

Plaintiff Vera Elue, who is African American, began working as an attorney for the City of Chicago in 2001. [56] ¶¶ 1, 3.[1] Most recently, Elue worked for the Department of Business Affairs and Consumer Protection, and she became a Senior Attorney in 2006. *Id*. ¶¶ 1, 5. The Department was responsible for licensing and regulating businesses operating in the City and enforcing certain municipal ordinances and laws. *Id*. ¶ 4. In 2012, Elue worked in the Prosecutions and Adjudications Division. *Id*. ¶¶ 5–6. The Division's adjudication activities included, among other things, running community meetings, remediation conferences, and settlement conferences; managing the in-house administrative courtroom; and reviewing disclosure documents. *Id*. ¶ 8. The prosecution activities included a public vehicle call; a cab call; a business license, retail, and tobacco call; a consumer fraud call; and special prosecutions, among others. *Id*. ¶ 7.[2] When an attorney was assigned to a certain call, she was responsible for prosecuting the relevant tickets, complaints, or violations in court. *Id*. For example, the retail call involved prosecuting tickets for

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Elue's responses to the City's Local Rule 56.1 statements, [56], and the City's responses to Elue's Local Rule 56.1 statements, [63], where both the asserted fact and the opposing party's response are set forth in one document.

[2] Elue points out that some of the City's asserted details about these calls were not applicable before 2017.

unlicensed businesses, ordinance violations, and tobacco-code violations. *Id.* The consumer fraud call involved prosecuting businesses who engaged in deceptive or unfair practices. *Id.* Barbara Gressel served as the Deputy Commissioner of the Prosecution and Adjudications Division beginning in October 2012. *Id.* ¶ 6. Rosemary Krimbel was the Commissioner of the whole department from June 2011 through February 2014, when Maria Guerra Lapacek took over. *Id.* ¶ 4.

### 1. The Retail and Consumer Fraud Calls

Elue worked on both the retail and consumer fraud calls and was a specialist and expert in handling both. [63] ¶¶ 1–2.[3] As of 2010, Elue and one other attorney handled the retail call, with the help of Gressel, who was the supervisor. [56] ¶ 11. On the retail call, Elue had anywhere from 50–200 cases two days per week, or 10,000 to 15,000 per year, many of which were not routine. [63] ¶ 1; [53-3] at 60:9–61:1, 78:9–10; [57-6] ¶ 4. Her calls generated the highest assessed fines. *See* [53-9] at 135:16–21.[4] Revenue generation was important because the revenue the Department brought in affected its budget. *See* [63] ¶ 4; [53-6] at 16:23–17:13. Some commissioners considered revenue generation when assessing an attorney's performance, though Krimbel claims she did not. *Id.*; [53-3] at 86:12–87:19.

---

[3] Elue mischaracterizes Krimbel's testimony on this point, but the City admits that Gressel referred to Elue as a specialist and expert on the retail call.

[4] The amount in fines Elue generated is not supported by the citations to the record. When asked whether the reports she was shown were correct, Gressel did not know where the reports came from. [53-9] at 136:23–137:7. Elue testified that for the retail and fraud calls together, the assessed revenue was over $11 million. [53-3] at 77:9–11.

The consumer fraud call involved fewer, but more complex and sophisticated cases than the retail call. [63] ¶ 2; [53-3] at 69:4–6. On the consumer fraud call 10–15% of cases went to trial, and Elue had the necessary qualifications to prosecute those cases, which included doing trials, presenting evidence, and making presentations to an administrative law judge. [63] ¶ 2. It was also the best place for Elue to expand her role in the Department, show off her attorney skills, be noticed, interact with other attorneys, and do trial work. *Id.*[5] While working the fraud call, Elue regularly filed briefs and prepared for cross-examination. *Id.*[6] From May 2012 through February 2014, Elue was the only attorney handling both the retail call and the consumer fraud call, and Gressel's predecessor and Krimbel assigned a non-attorney, John Mariane, to assist her. *Id.* ¶ 5; [56] ¶ 12. In response to Elue's requests for additional help, Gressel assigned another attorney to assist Elue in October 2012, but she resigned about seven months later. [56] ¶ 12. Another attorney helped Elue during his brief employment in 2014. *Id.* In handling both the retail and fraud calls, Elue regularly worked seven days a week. *Id.*

In late January or early February 2014, Elue was taken off the retail call and Gressel assigned attorney Matthew Frost in her place. *Id.* ¶¶ 14–15; [63] ¶ 13. Frost previously worked for the City doing cab and public vehicle complaints and reviews, starting as a law clerk in 2010. [56] ¶ 14. Frost was admitted to practice law in

---

[5] Though Krimbel made this statement in 2008, it illustrates the benefits of working the fraud call and is relevant.

[6] Elue did not produce any briefs she filed in response to the City's request, but viewing the facts in her favor, I take her assertion that she wrote briefs as true.

November 2011, though he retained his law-clerk title until 2014. *Id*.; [53-4] ¶ 10. Gressel assigned Elue to continue with the consumer fraud call, to roll out and enforce a new ordinance, and to assist Gressel with adjudications, including community meetings and remediation conferences. [56] ¶ 16. Elue repeatedly asked Gressel why she was taken off the retail call and whether it was retaliation. [63] ¶ 12. Gressel never responded. *Id*.

In April 2015, Guerra, who had replaced Krimbel as Commissioner, assigned two new attorneys to the consumer fraud call. [56] ¶ 19. One of those attorneys previously worked as the Deputy Commissioner for the Cable Division. *Id*. His duties had diminished over time, and Guerra was searching for additional responsibilities for him. *Id*. In turn, Elue was removed from the fraud call and assigned to assume responsibility over the Department's enforcement of a new Minimum Wage Ordinance and to continue assisting Gressel with adjudications. [56] ¶ 20. Both newly assigned attorneys were African American. *Id*. ¶ 3. Elue did not believe Guerra held any hostility or ill feeling toward African Americans. *Id*. ¶ 22.

Neither community meetings—which Gressel once referred to as a waste of time—nor remediations involved courtroom work. [63] ¶¶ 18, 20. Although supervising community meetings did not require a law license, Gressel and other attorneys, such as James Potter, often ran them. [56] ¶ 24; *see also* [53-4] at 41. Both Gressel and Potter were white. [56] ¶ 3. According to Gressel, "no nonlawyer ha[d] handled community meetings under [her] watch." [53-9] at 76:7–8. From 2010–2017, Gressel attended 193 community meetings, Elue attended 75, another attorney

attended 56, and Potter attended 28. [53-4] at 41. In November 2012, before her reassignments, Elue sent an email to Gressel asking, "Is there a reason why I am the only attorney in this Department who has not been involved with the community hearings?" [53-2] at 44.

     2.    *ARDC Investigation of Mariane*

In about April 2012, when Elue was still on both the retail and consumer fraud calls, Mariane (the nonlawyer who assisted Elue) received a letter from the Illinois Attorney Registration and Disciplinary Committing inquiring whether he held himself out as a city attorney when settling a case. [56] ¶ 28. Krimbel told Gressel not to handle the matter, and to refer it to the City's Law Department. *Id*. According to Elue, Gressel told her about the ARDC complaint and said that Elue needed to "cover him up" and write an affidavit saying she was the supervising attorney and Mariane had not practiced law. [63] ¶ 35. Elue told Gressel that would be a lie and that she was not going to say anything untrue. *Id*.

On May 3, 2012, an attorney from the law department emailed Mariane and Elue requesting a meeting to discuss verified statements in response to the ARDC inquiry. [56] ¶ 31. The next day, that attorney and Mariane exchanged emails, on which Elue was copied, scheduling a meeting at the Department. *Id*. A week later, Elue emailed the law-department attorney indicating what she was "willing to state" in her verified statement. *Id*. ¶ 32. He responded saying, "we had talked about a bunch more at our Monday meeting. I need to find out why you are uncomfortable with covering those points." *Id*. On May 21, he told Elue he "would like to cover those

matters we discussed in our meeting if you are comfortable about covering those," citing for example, "that the system works that you are sent out for settlement discussions, not a pre-trial, and a narrative of what happened." *Id*. ¶ 33; [53-3] at 144. Elue claims this statement would have been a lie. [63] ¶ 35. Elue sought another meeting that day and then sent the attorney a revised statement covering the requested information. [56] ¶ 33. Three days later, he sent Elue certification language, and Elue requested he prepare her statement because she was too busy. *Id*. ¶ 34. He sent Elue a proposed statement, and she sent it back with one change, omitting a reference to Elue working with Mariane "a number of years," explaining they had worked in the same building but not the same department. *Id*. The submitted affidavit—one that Elue had no qualms about—said that Elue was an attorney and that she had never seen Mariane hold himself out as an attorney in court. [53-3] at 165.

### 3.    *Gressel's Conflict of Interest*

In 2013, the City's Enforcement and Investigation Division issued tickets to payday lenders for failing to disclose required information in their licensing applications. [56] ¶ 38. The City's licensing division had told these payday lenders, whose tickets Elue was assigned to prosecute, that they were in compliance due to a grandfathering provision in the zoning code. *Id*. ¶ 40. On July 9, Gressel and Elue met in Gressel's office to discuss the issue, and Gressel called her husband, an attorney who did zoning work, to explain the relevant law to Elue. *Id*. ¶ 41. When the issue came up in court, Elue was unsure how to respond, so she called Krimbel (still

the Commissioner at that time) to discuss it. [53-3] at 295. Two days later, Gressel's husband appeared in court representing some payday lenders adverse to the City. *Id.* at 297. There are some discrepancies over the timing of these events, but Elue says she called Krimbel that day and told her she was concerned that Gressel's husband created a conflict of interest. [63] ¶ 39; [53-3] at 168:12–169:9. On July 11, Elue sent Krimbel a four-page email explaining the payday loan issue and mentioned that Gressel's husband represented the lenders in some of the relevant cases. [56] ¶ 45. Krimbel does not believe she read Elue's email and instead forwarded it to Gressel at 3:48 p.m. telling her, "deal with this." *Id.* ¶ 46. After Gressel received Krimbel's email, she was irritated and stepped into Elue's office. *Id.* ¶ 47. Four minutes after receiving Krimbel's email, Gressel responded, "done." *Id.*

That afternoon, Elue sent an email to herself saying that Gressel called her to warn her not to "contact the commissioner any more regarding this payday loan cases, that [the] commissioner is under stress and that I must not contact her or mention her husband . . . on this case because now, I have put her in an uncomfortable position by bringing this issue to the commissioner's attention." [53-3] at 316. Elue also wrote that Gressel was busy, that they would discuss it more later, and to "never to bring this to the commissioner's attention again ever. Issue is that Barbara's husband . . . represents some payday loan respondents in our cases." *Id.* Elue then went on to discuss her original question regarding the payday loan cases and then said, "Is the Commissioner mad at me for bringing this issue to her attention, or is Barbara mad at me for bringing this to the Commissioner's attention?" *Id.*

At her deposition, Elue said that the same day she sent the email to herself, Gressel came in her office, banged her hand on the table, and using profanity and red in the face said, "Vera I am warning you. Never in your life ever write or complain to the Commissioner or anybody about me or mention me or my husband because now you have put me in an uncomfortable position. And I am telling you, if you ever do this again, I will fix you, I will get you, I will deal with you, and I will teach you a lesson, a lesson of your life that you will never forget." [63] ¶ 40.[7]

Neither Gressel nor Elue knew that Gressel's husband represented payday lenders when they spoke to him on the phone in Gressel's office. [56] ¶ 41. Gressel recused herself from her husband's client's cases in August 2013, when she received an email from the Enforcement and Investigation Division asking whether the case should be nonsuited. [53-4] ¶ 28. In the summer and fall of 2013, Elue complained to the City's Office of Inspector General about Gressel's conflict of interest. [63] ¶ 41. On February 13, 2014, she filed a written report to the OIG. [56] ¶ 63. Soon after Guerra became Commissioner in February 2014, Guerra told Gressel that Elue might be filing a complaint about Gressel's conflict of interest with the OIG. [63] ¶ 10.

4.    *Assistant Commissioner Position*

In November 2013, Elue told Gressel she wanted to apply for an Assistant Commissioner position. *Id*. ¶ 6. Gressel responded: "Vera do not apply for that position, I don't want you to apply. I want you to stay doing what you are doing. You

---

[7] Gressel disputes many of the statements Elue attributes to her, but I view disputed facts in Elue's favor.

9

are the expert in consumer fraud and retail. . . . You generate a lot of revenue and you are good at it. Nobody is as good as you. . . . I can't train anybody to be like you." *Id*. Gressel also told Elue she was qualified for the Assistant Commissioner job, "probably the most qualified." *Id*. During her December 2013 interview, Gressel and Krimbel told Elue that she was good and satisfied everything they needed. *Id*. ¶ 7. At the interview, Elue told Krimbel and Gressel, she had used Business Objects software only a few times. [56] ¶ 57. She had not used software reporting tools to evaluate personnel or ongoing programs. *Id*. The job announcement did not list software proficiency as a criterion. [63] ¶¶ 30, 32; [53-2] at 151–52. The announcement said the position required applicants to complete an interview, which would include a written exercise and skills assessment test, though no applicant was given one. [63] ¶ 31.

Gressel and Krimbel also interviewed Potter, the attorney who had been helping Gressel with community meetings. *Id*. ¶ 58. Potter was admitted to the Illinois bar in 2007 but had the title of law clerk until 2009. *See* [63] ¶ 33; [53-9] at 126:3–19; [63-4] at 5. In their notes from Potter's interview, Krimbel and Gressel flagged his experience using Business Objects and Excel to pull data, track his matters, and create reports. [56] ¶ 58. They both recommended him for the position. *Id*. Krimbel and Gressel passed their recommendation of Potter on to the City on December 23, 2013,[8] and the City formally announced Potter's promotion on January

---

[8] Elue's assertion that Gressel had pre-selected Potter does not controvert that Gressel formally recommended him on December 23. And Elue's evidence—that Mariane told her Potter was selected before the Department posted the position—is hearsay. Mariane was not authorized by the City to make this statement, nor did he make it within the scope of his

30, 2014. *Id*. ¶ 59. Potter's new salary was $81,456, less than Elue's salary at the time. *Id*. ¶¶ 1, 59. In February 2014, Elue filed a discrimination complaint with the City's Department of Human Resources and a discrimination charge with the EEOC. [56] ¶¶ 62, 64.

### 5.   *Evidence of Racial Animus*

On three occasions during the summer of 2013, Elue told Gressel that African American investigators were being discriminated against. [63] ¶ 43. Each time Gressel told Elue, "I don't fucking care about those Black people," "they are lazy," and "I don't give a shit about those Black people." *Id*. At least three times in the fall of 2013, Gressel told Elue that a black investigator was lazy, and on several occasions from 2013 to 2016, Gressel told her that a black attorney was lazy. *Id*.[9] Also in the fall of 2013, Elue complained that Sam Kavathas, a private attorney who represented clients opposite Elue in court, said that a white man should be running the call instead of Elue. [63] ¶ 44. In mid-November, Gressel told Elue she should prep the cases, but let "the white guys . . . make the [settlement] offers to Sam." *Id*. In response to Elue's complaint, Gressel removed Elue from assignments that required dealing with Kavathas. *Id*. ¶ 45.

---

employment. *See Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 992 (7th Cir. 2016). There is also no evidence he was a decisionmaker or had any role in the decisionmaking process. *See Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007).

[9] Gressel disputes these statements and the City points out that in response to interrogatories, Elue phrased them as, "why do you worry about *those* people?" and "I do not give a shit about *those* people." *See* [53-12] ¶ 6. This is not inconsistent with what Elue said at her deposition, and I view the facts in Elue's favor.

On many occasions during community meetings, Gressel referred to Elue as her attack dog. *Id*. ¶ 46. Elue told Gressel she did not like it and asked her to stop, but Gressel continued. *Id*. In 2016, during a performance evaluation, Gressel mocked Elue's accent and questioned why she talked with a "Black accent." *Id*.

## III. Analysis

Elue brings claims under Title VII for disparate treatment and retaliation, 42 U.S.C. § 2000e-2(a)(1), 2000e-3(a), and under the Illinois Whistleblower Act, 740 ILCS 174/15(b), 20. She argues that the City's failure to promote her and decisions to reassign her from the fraud and retail calls were materially adverse actions in violation of each of these provisions.

### A. Disparate Treatment

When evaluating a disparate-treatment claim, the sole question is whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race caused the adverse employment action. *Ortiz v. Werner Ents., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). A plaintiff can employ the *McDonnell Douglas* burden-shifting framework to organize and present her evidence. *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 412 (7th Cir. 2018). Under this framework, the plaintiff must establish a prima-facie case of discrimination. *Id*. The burden then shifts to the employer to offer some legitimate, nondiscriminatory justification. *Id*. If the employer does that, the plaintiff must show that the defendant's stated reason is pretextual. *Id*. Elue argues that based on the evidence of Gressel's racial animus, a reasonable

juror could conclude that the City denied her a promotion and reassigned her from the retail and consumer fraud calls because of her race.

### 1. *Failure to Promote*

Failing to promote an employee is a materially adverse employment action when the position for which the plaintiff was rejected offered better compensation, responsibilities, or title. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). The City does not argue that the Assistant Commission position was not a promotion. To establish a prima-facie case on a failure-to-promote claim, a plaintiff must offer evidence that (1) she was a member of a protected class, (2) she was qualified for and applied to the position sought, (3) she was rejected, and (4) the employer hired someone outside the protected class. *Oliver*, 893 F.3d at 413.[10] Elue has demonstrated a prima-facie case; she is African American, she was qualified (Gressel told her she was probably the most qualified), the City rejected her, and it hired Potter, who is white, instead. The City asserts that its decision to hire Potter was legitimate because he had more experience with relevant software. Elue argues the City's reason is pretext for race-based discrimination, as evidenced by Gressel's demonstrated racial hostility toward African Americans.

---

[10] The prima-facie test can include whether the plaintiff was as qualified or more qualified than the person who got the promotion. *See Riley*, 829 F.3d at 892. The City argues this is the proper test and that, because Elue has not demonstrated she was more qualified than Potter, there is no need to consider whether the City's justification is pretextual. Whether considered as part of plaintiff's prima-facie case or in analyzing whether the defendant's justification is pretextual, the promoted employee's qualifications are part of the analysis. *See Oliver,* 893 F.3d at 413. The same is true for evidence of pretext. Parties can use the burden-shifting framework to organize evidence, but *Ortiz* requires considering all evidence together before reaching a conclusion. *Ortiz*, 834 F.3d at 765–66.

"Where an employer's reason for [an adverse action] is without factual basis or is completely unreasonable, that is evidence that an employer might be lying about its true motivation." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013). Elue asserts that Gressel told her she was probably the most qualified for the job, but also discouraged her from applying, which is counterintuitive and undercuts the City's assertion that Potter's software skills justified choosing him over Elue. Elue also notes that the job announcement did not indicate that knowledge of software programs was required, that Gressel and Krimbel failed to ask her questions about her software skills at the interview, and that their notes do not accurately represent what took place at the interview. The City points out that Elue told Gressel and Krimbel she had only used Business Objects a few times and that the failure to ask her more questions, which would have further demonstrated her lack of skills, was not detrimental. But the failure to ask the questions, combined with the fact Gressel discouraged Elue from applying even though she was perhaps the most qualified candidate, could show that Gressel and Krimbel did not value Potter's software skills as much as they claim.

As evidence that the City's justification was pretext for her race, Elue points to Gressel's race-based comments. "[D]erogatory remarks are relevant if they are made by someone who provided input into the adverse employment decision." *Hasan v. Foley & Lardner, LLP*, 552 F.3d 520, 528 (7th Cir. 2008). The recency of the discriminatory comments, who made them, and how extreme they were are all factors to consider in determining whether the demonstrated bias may have motivated the

adverse employment decision. *Id*. Gressel undoubtedly had input into the promotion decision. And viewing the facts in Elue's favor, Gressel's race-based comments were relatively close in time to the promotion decision, made directly to Elue, and relevant to her employment. Gressel was not only dismissive of Elue's complaint about black investigators, but actively hostile to the idea that Elue should be concerned about other black people. She also consistently referred to other black employees as lazy. And when Elue complained about Kavathas's racial comment, Gressel's response was to remove Elue from his cases. This permits an inference that Gressel considered Elue's race, or at least the way other people felt about Elue because of her race, when deciding the scope of her employment. Gressel also mocked Elue's accent and referred to her as an attack dog. These comments were made after the decision to promote Potter, but a reasonable factfinder could conclude that they referenced Elue's race and that they demonstrate Gressel's motivations at the relevant time.[11]

Krimbel also had a say in the promotion decision, and there is no evidence of her racial animus. But Gressel's animus could still have caused the outcome. The City argues that there is insufficient evidence of Gressel's animus because the comments Elue relies on are stray remarks, some of which do not clearly reference race or were made sarcastically. The City also points out that Elue had complained about Kavathas to her previous supervisor as well, and notes that supervisor implemented the same solution: removing Elue from assignments that required interacting with

---

[11] Elue asserts that Gressel referred to her as an attack dog at community meetings, and Elue did not begin attending community meetings until 2014. [63] ¶ 46; [53-4] at 41.

Kavathas. Because Elue does not believe that supervisor racially motivated, the City argues, Gressel must not have been either. But two people can do the same thing for different reasons. Though removing Elue from these assignments on its own may not be enough to allow an inference of racial animus, all evidence must be assessed cumulatively. Similarly, stray remarks, or remarks that require speculation to conclude they are about race, on their own, are not enough to establish that a decision was race-based. *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 791–92 (7th Cir. 2015). But considering Gressel's remarks—some of which referenced race explicitly—together with the circumstances surrounding the promotion, as *Ortiz* requires, a reasonable juror could conclude that Gressel's decision not to promote Elue was based on her race and that the City's purported justification is pretextual.

### 2. Reassignments

Elue argues that her reassignments from both the retail call and the fraud call were racially motivated. To give rise to a claim, the reassignment must have been materially adverse. *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745–46 (7th Cir. 2002). There are three general categories of materially adverse employment actions actionable under Title VII: (1) where the employee's financial conditions were affected; (2) where a nominally lateral transfer significantly reduced the employee's career prospects by preventing her from using her skills and experience, stunting her career; and (3) where the employee's work conditions were significantly altered. *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). Elue argues that her reassignments fall in the second category because they reduced her time in the

16

courtroom. The City agrees that Elue preferred being in court and that she was good at it, recovering more fines than any other attorney. But an employee's subjective preference for one position does not give rise to a claim. *See Herrnreiter*, 315 F.3d at 745.

Elue's conclusory assertions that being assigned to the retail or fraud call was more prestigious or beneficial to her career, without any evidence aside from her personal beliefs, is insufficient to create a genuine dispute of material fact regarding whether her reassignments were materially adverse. *See O'Neal*, 392 F.3d at 912 (holding the transfer of a sergeant from administrative duties to beat-sergeant duties was not materially adverse because there was no accompanying pay decrease, no evidence she was more likely to be promoted in her previous role, and the new responsibilities were within the scope of a sergeant's duties). Although non-attorneys could conduct some of Elue's new tasks, such as the community meetings and remediation conferences, it was common practice at the City to have attorneys conduct them. Elue's supervisor, Gressel, said she never assigned a non-attorney to run a community meeting. And Gressel ran more community meetings than anyone else. Before Potter got the job Elue argues she was more qualified for, he ran community meetings too. This indicates that, contrary to Elue's assertions otherwise, experienced attorneys typically ran community meetings, and running them was not detrimental to Elue's career. And though Elue now complains about these meetings, when she was on the retail and fraud calls she asked Gressel why she was the only attorney not assigned to conduct them. That the meetings were boring or felt like a

waste of time does not matter; they were well within the scope of a City attorney's duties.

In addition to the community meetings, Elue also kept some of her old consumer-fraud cases, helped with remediation conferences (which she compared to mediations) and enforced new ordinances. The fraud call may have been the best place for Elue to improve her trial skills, and her reassignments led to less time in the courtroom, but assigning Elue to help with adjudicative tasks once she had years of courtroom experience is consistent with the career trends of other City attorneys (such as Potter and Gressel). Elue's new responsibilities were not objectively inferior and so do not give rise to a discrimination claim.

**B.      Title VII Retaliation**

To state a prima-facie case of retaliation, a plaintiff must demonstrate: (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that there is a causal link between the two. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). The City agrees that Elue engaged in statutorily protected activity in the summer of 2013 when she reported disparate treatment of the investigators and in October 2013, when she complained about Kavathas's comment that a white attorney should run the call instead of Elue. The City also stipulates that Elue's February 2014 charges with the EEOC and the City's Human Resources Department were protected activity, but those took place after the City made its decision not to promote Elue—the only materially adverse action. In the retaliation context, "a materially adverse action is one which might well have dissuaded a

reasonable worker from engaging in protected activity such as making or supporting a charge of discrimination." *See Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018). Though this is a different test than in the discrimination context, the outcome here is the same. A reassignment to tasks that are not objectively inferior would not dissuade a reasonable employee from engaging in protected activity.

A causal connection between the protected activity and adverse action exists if the defendant would not have taken the adverse action but for the plaintiff's protected activity. *Id.* Showing pretext is not enough, the plaintiff must present "evidence from which a jury could find that it was a pretext *for retaliation.*" *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017). Elue points to Gressel's threats to teach her a lesson after Gressel learned that Elue had flagged the conflict of interest with her husband's practice. But because that threat is not linked to Elue's Title VII protected activity (it had nothing to do with reporting or opposing discrimination), it does not support her Title VII retaliation claim. Elue also argues that there is an overarching pattern of the City treating white employees better than black employees and of the City consistently mistreating Elue. But there is nothing to show that Elue's Title VII-protected activity leading up to the promotion decision caused this mistreatment. Elue also relies on the same evidence discussed with respect to her discrimination claim—Gressel expressed hostility to the notion of disparate treatment of investigators and adjusted Elue's duties after she mentioned Kavathas's racism. Though Gressel was dismissive of Elue's complaints and did not handle them appropriately, there is no evidence that she was upset with Elue for making them, or

thought that Elue's opposition to discrimination justified favoring Potter. So while this evidence may support a finding that the failure to promote Elue was the product of discrimination, it does not support an inference of Title VII retaliation. Her race may have factored into the promotion decision, but her complaints of discrimination did not.

## C. Illinois Whistleblower Act

To prevail on either her Section 15 or 20 claim under the Illinois Whistleblower Act, Elue must again show that the retaliatory action was materially adverse. *See Elue v. City of Chicago*, No. 16 CV 9564, 2017 WL 2653082, *5 (N.D. Ill., June 20, 2017). For the same reasons discussed, only her failure-to-promote claim qualifies. Section 15 of the Illinois Whistleblower Act prohibits an employer from retaliating against an employee "for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b). To demonstrate a violation, a plaintiff must show: (1) an adverse employment action by her employer, (2) which was in retaliation, (3) for the employee's disclosure to a government or law enforcement agency, (4) of a suspected violation of an Illinois or federal law, rule, or regulation. *Sweeney v. City of Decatur*, 2017 IL App (4th) 160492, ¶ 15.

Elue asserts that she reported a suspected violation of Illinois ethical rules to a government or law enforcement agency when she told Krimbel about Gressel's conflict of interest with her husband's cases. Gressel may not have been specifically

assigned to her husband's cases and she eventually recused herself, but Elue still had reasonable cause to believe Gressel had violated the relevant rules before her recusal. Elue explains that Gressel had represented the City in cases opposite her husband in the past, and that Elue suspected Gressel of negotiating lower fines with her husband's clients. Whether Elue was correct or genuinely believed this cannot be resolved at this stage; her assertions are taken as true, and that is enough to constitute a suspected violation.

The City argues that internal reports do not give rise to a whistleblower claim, but "no exceptions apply if the government or law-enforcement agency is also the employer." *Brame v. City of N. Chicago*, 2011 IL App (2d) 100760, ¶ 3. And because Gressel threatened Elue directly because of Elue's report of an ethical violation, a juror could reasonably conclude that Gressel's decision five months later not to promote her was in retaliation for that report. The City says that Elue's email to herself, which asked whether Gressel might be mad her, is inconsistent with Elue's account of Gressel storming into her office and threatening her. But questions of credibility and weighing the evidence cannot be resolved here. Similarly, whether Elue's account is true is up to a jury, and these questions of fact prevent summary judgment.

To prevail on her Section 20 claim, Elue must establish: (1) she refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation and, (2) her employer retaliated against her because of that refusal. 740 ILCS 174/20. Elue argues that Gressel wanted her to write a false

affidavit to protect Mariane during the ARDC inquiry and that when Elue refused to do so, Gressel retaliated against her. Viewing the facts in Elue's favor, Gressel asked Elue to vouch for Mariane, and some of the things Gressel asked her to say would have been a lie. After an exchange with the City's law department attorney, Elue wrote a statement she was comfortable with and submitted it. After further investigation, the ARDC decided not to pursue the issue. There is no evidence that this exchange, which took place in the spring of 2012, motivated Gressel's decision not to promote Elue over a year later. Without anything linking the two events, no reasonable juror could conclude Gressel declined to promote Elue because of her refusal to write a false statement for Mariane.[12]

## IV. Conclusion

The City's motion for summary judgment, [51], is granted in part, denied in part. Elue may proceed with her Title VII discrimination claim and her Illinois Whistleblower Act Section 15 claim, based on the failure to promote.

ENTER:

Manish S. Shah
United States District Judge

Date: September 28, 2018

---

[12] Elue fails to address the City's arguments about her Section 20 claim, and so waives any argument to the contrary.